UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **Michael Hopkins,** | | CASE NO. 15cv788 JLS (PCL) |
| | Plaintiff, | **REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 63.)** |
| v. | | |
| **R. Bustos et al.,** | | |
| | Defendants. | |

**I.**

**INTRODUCTION**

On April 9, 2015, Plaintiff Michael Hopkins, a California inmate, filed a civil rights action under 42 U.S.C. § 1983 against four defendants: correctional officer R. Bustos, correctional nurse J. Mooky, correctional warden Daniel Paramo, and Secretary of CDCR Jeffrey Beard.[1] (Doc. 1.) While Plaintiff made Eighth Amendment claims against R. Bustos and J. Mooky, these defendants were never served. Plaintiff did serve Warden Daniel Paramo and the Secretary of CDCR, currently Scott Kernan. Against these two served defendants, Plaintiff alleged a Fourteenth Amendment Due Process violation for being denied admittance into the developmentally disabled program which would have enabled him to file

---

[1] The current Secretary of CDCR, Scott Kernan, should be substituted for former Secretary Beard on Plaintiff's official capacity claim. Fed. R. Civ. P. 25(d).

1

grievances against correctional staff while he was incarcerated at RJ Donovan State Prison. For relief, Plaintiff requested an injunction preventing defendants "from denying him assistance with reading and writing." (Doc. 1, at 9.)

Defendants have filed a Motion for Summary Judgment (doc. 63), and Plaintiff has opposed the motion (docs. 76 and 80). For the following reasons, the Court recommends that Defendants' motion be GRANTED.

## II.

## BACKGROUND

Plaintiff claims that the Alameda County Superior Court found him developmentally disabled under California Penal Code section 1370.1. (Doc. 1, at 5.) Plaintiff claims that this court order would have been delivered to CDCR when he was committed to RJ Donovan on July 5, 2012. (Doc. 1, at 5.) Thus, he contends that Defendants Beard and Paramo should have known that Plaintiff "was deemed developmentally disabled by a court of law." (Doc. 1, at 5.) Plaintiff alleges that he petitioned prison staff for help with reading and writing as well as filing inmate appeals regarding harassment by correctional staff and his failing mental health. (Id.) Plaintiff claims that he asked Defendants Beard and Paramo "to honor his ADA status" and for help with the institutional grievance system. (Id.) However, Plaintiff alleges that Defendants Beard and Paramo refused to allow Plaintiff to participate in Donovan's Developmentally Disabled Program. (DDP). (Doc. 1, at 6.)

On August 26, 2014, Plaintiff allegedly paid another inmate to write an inmate grievance for him complaining about certain correctional officers' deliberate indifference to his mental health concerns. (Id.) When he received no response, he allegedly filed a second inmate appeal on September 30, 2014, stating that he was having problems communicating, writing, spelling, filing paperwork, and understanding things "due to his mental handicap." (Id.) In the second appeal, he also asked that he be admitted into Donovan's DDP program. (Id.)

Plaintiff claims that Defendants Beard and Paramo refused to process the September 30, 2014 appeal because it was a duplicate of his August 26, 2014 appeal. (Id.) But on or about October 18, 2014, they responded to Plaintiff's August 26, 2014 appeal, partially granting it and stating that he would be interviewed concerning his request for assistance. (Id.) However, Plaintiff continued to be denied

participation in the DDP. (Id.) On November 14, 2014, J. Lewis responded to Plaintiff's August 26, 2014 appeal. (Doc. 1, at 7.) Allegedly discovering that Defendant Paramo had failed to evaluate Plaintiff for inclusion in the DDP, J. Lewis ordered Defendant Paramo to evaluate Plaintiff for the DDP within two weeks of November 14, 2014. (Id.) But after receiving J. Lewis' order, Defendant Paramo failed to comply. (Id.)

Plaintiff allegedly continued to ask staff at Donovan for assistance with his disabilities, and, on January 15, 2015, he began a hunger strike to protest Donovan's refusal to admit him into the DDP. (Id.) Plaintiff claims that Defendants Beard's and Paramo's failure to allow Plaintiff to participate in the DDP violated Plaintiff's Fourteenth Amendment rights. (Id.)

## III.

## EVIDENCE PRESENTED

A. Defendants' Proffer

Before Plaintiff's current incarceration for an April 4, 2012 conviction, Plaintiff was incarcerated in state prison under CDCR number V74696. (Doc. 63-8, at 2, Decl. Pope at ¶ 3.) During that time, his educational level was tested, and he scored 5.1 on the Test of Adult Basic Education, meaning he scored at the fifth grade level plus one month. (Id.) Plaintiff was also tested in accordance with the *Clark v. California* Remedial Plan to determine whether he should be placed in CDCR's DDP. (Id.) *Clark v. California* is a class action lawsuit addressing the accommodation of California inmates with developmental disabilities in accordance with the Americans with Disabilities Act. *Clark v. California*, 739 F. Supp. 2d 1168 (N.D. Cal. 1996). Plaintiff received a passing score on the cognitive test and was excluded from the DDP on that basis. (Doc. 63-8, at 2, Decl. Pope at ¶ 3.)

Following his release from prison for the prior offense, Plaintiff was charged in a new criminal proceeding with multiple felony offenses. (Doc. 63-3, Exhibit 1.) In June 2010, Alameda County Superior Court suspended criminal proceedings against Plaintiff on these new charges pursuant to California Penal Code section 1368 and ordered evaluations of Plaintiff to determine his competency to stand trial. (Id.) After reviewing the reports prepared by the evaluators, the court determined that Plaintiff was a mentally incompetent person within the meaning of 1368 and ordered that he be referred

for placement under California Penal Code section 1370. (Id.) Plaintiff was thereafter committed to Napa State Hospital. (Id.)

On November 4, 2011, the trial court, upon review of a report of mental competency prepared pursuant to California Penal Code section 1372, reinstated criminal proceedings. (Id.) On April 4, 2012, Plaintiff pleaded no contest to the charges against him and was eventually sentenced to state prison. (Id.)

Plaintiff was committed to state prison on July 5, 2012. (Doc. 63-8, at 2; Decl. Pope at ¶ 4.) On the same day, he was given the "Quick Test" pursuant to the *Clark v. California* Remedial Plan, to again measure his cognitive abilities and determine whether he should be placed in CDCR's DDP. (Id.)

The DDP was developed in accordance with the *Clark* Remedial Plan to ensure the identification and appropriate classification, housing, protection, and nondiscrimination of inmates and parolees with developmental disabilities. (Doc. 63-4, Decl. Wofford at ¶ 2.) The DDP applies to all CDCR institutions and facilities, to all programs that CDCR provides or operates, and to all inmates and parolees who are developmentally disabled. (Id.) The primary objective of the DDP is to provide equal access to programs and services to inmates and parolees with cognitive and adaptive disabilities. (Id.) Criteria for inclusion in the DDP are low cognitive functioning and concurrent deficits or impairments in adaptive functioning. (Id.) Adaptive functions are defined as abilities necessary to care for oneself and to access programming and services in the correctional setting. Both criteria must be met. (Id.)

Under the *Clark* Remedial Plan, all CDCR inmates are screened for developmental disabilities upon incarceration in CDCR institutions, using standard instruments. (Doc. 63-4, Decl. Wofford at ¶ 3.) A multi-phase process and clinical judgment are used to identify those inmates who fit the criteria for developmental disabilities. (Id.) Phase I should take place within seven days after an inmate arrives at a reception center or clinical staff receives a referral. (Id.) Under Phase 1, cognitive skills are best tested using either the Quick Test or the Test of Nonverbal Intelligence based on established criteria. (Id.) The Quick Test is a cognitive screening tool used in a variety of settings to provide a rapid estimate of cognitive functioning. (Id.) If an inmate fails the Phase I test, he is given the Phase II test within seven days of failing Phase I. (Id.) If the inmate fails the Phase II test, he is given the Phase II test within seven days of failing Phase II. (Id.)

In Plaintiff's case, Plaintiff passed the Quick Test on July 5, 2012, and was therefore not placed in the DDP. (Doc. 63-8, Decl. Pope at ¶ 9 and Exhibit 2.) According to health care appeals records, Plaintiff filed an inmate health care appeal (log no. RJD HC 14050684) in March 2014, requesting placement in DDP, but it was screened out and returned to him because he had not signed or dated it. (Doc. 63-9, at 7, Decl. Robinson at ¶ 9.) He also filed another health care appeal on September 30, 2014, requesting placement in the DDP program, but that was screened out because it duplicated his August 26, 2014 health care appeal, which was pending at the time he filed his duplicate appeal. (Id.)

Inmate health care appeals are handled by California Correctional Health Care Services (CCHCS). (Doc. 63-9, at 2, at Decl. Robinson at ¶ 3.) CCHCS is overseen by the Federal Receiver who was appointed by the federal court in the *Plata v. Brown* class action lawsuit, United States District Court, Northern District case no. 01-01351. (Id.) CCHCS is not overseen by the Secretary of CDCR. (Doc. 63-9, 8, Decl. Robinson at ¶ 11.)

Mental health staff evaluated Plaintiff on October 3, 2014, in response to his August 26, 2014 appeal, and it was noted that Plaintiff was not willing to cooperate with being evaluated and tested. (Doc. 63-5, at 3 Exhibit 1 to Decl. Custodian of Records.) Medical staff B. Main, Psy.D., Chief Psychologist, and M. Glynn, Chief Executive Officer of Health Care for Donovan, responded to Plaintiff's August 26, 2014 health care appeal on October 8, 2014, at the second level of review. (Doc. 63-9, at 7, Decl. Robinson at ¶ 10.) They partially granted it, stating "[t]he program supervisor will interview you to discuss your level of care, any disagreements with treatment, possible options for receiving assistance with reading and writing, and to clarify what you mean by 'exhausting your administrative remedies' no later than 10/24/14. In addition, a referral was made to your primary clinician so that you could be interviewed to discuss your clinical concerns within an expedited time frame." (Id.)

Mental health staff evaluated Plaintiff again on October 9, 2014, and referred the matter to the DDP team for DDP evaluation. (Doc. 63-5, Exhibit 2 to Decl. Custodian of records.) A follow-up mental health evaluation on October 14, 2014 confirmed Plaintiff's referral to the DDP team for evaluation for DDP placement. (Doc. 63-5, Exhibit 3 to Decl. Custodian of records.)

1    Plaintiff took his August 26, 2014 health care appeal to the third level of review. (Doc. 63-9, at 8,
2 Decl. Robinson at ¶ 11.) J. Lewis, Deputy Director for CCHCS, responded to this appeal at the third
3 level of review and partially granted it. (Id.) She ordered that "[w]ithin two weeks, the DDP
4 psychologist shall review records/court orders/central file, and administer a DDP *Clark* Adaptive
5 Support Evaluation (CASE)." (Id.) She also ordered health care staff at Donovan to "[p]rovide a copy of
6 the CDCR 128C-2, Developmental Disability Program Screening Results, to demonstrate compliance
7 with this order." (Id.)
8    Plaintiff was not at Donovan when Deputy Director Lewis' order arrived at Donovan. (Doc. 63-9,
9 at 8, Decl. Robinson at ¶ 12.) Plaintiff had transferred to California Medical Facility (CMF) on
10 November 10, 2014, and did not return to Donovan until January 15, 2015. (Doc. 63-5, at 11, Exhibit 4
11 to Decl. Custodian of Records.) He then stayed at Donovan from January 15, 2015 until January 23,
12 2015, when he was transferred to California Institution for Men. (Id.) However, on January 27, 2015,
13 Plaintiff was given a *Clark* Adaptive Support Evaluation (CASE) at the California Institution for Men.
14 (Id.)
15    Following this evaluation, he was placed in the DDP program at the DD2 level, meaning he may
16 need occasional prompts to initiate or complete self-care and daily life activities; he may need adaptive
17 supports and additional supervision for appropriate interaction with others, following rules, and
18 avoiding social isolation; and he may need help in reading, writing, and preparing documentation. (Id.;
19 Doc. 63-8, at 12, Exhibit 3.)
20    A form was placed in Plaintiff's central file on February 6, 2015, documenting his need for
21 adaptive support services including "reasonable accommodations to assist in completing any forms or
22 documents (canteen ducats, medical slips, 602's, 1824 appeals for inmates with disabilities)." (Doc. 63-
23 8, at 4, Decl. Pope at ¶ 9; Doc. 63-8, at 30, Exhibit 6.)
24    Adaptive Support Logs kept at Donovan indicate that after Plaintiff was designated a DDP inmate,
25 he received daily DDP assistance while at Donovan in accordance with the *Clark v. California* Remedial
26 Plan, including help with retrieving property in Receiving and Release, for laundry exchange, to take
27 medications, to lock up, to shower, to clean his cell, and to go to the dining hall and the day room. (Doc.
28 63-8, at 4, Decl. Pope at ¶ 10; Doc. 63-8, at 34-55, Exhibit 7.) The Log also shows that staff regularly

checked on Plaintiff's welfare and provided other assistance as needed. (Doc. 63-8, at 34-55, Exhibit 7.) This assistance included reading to Plaintiff, helping him with his mail, and helping him fill out inmate appeals, requests for interview forms, and other CDCR forms and paperwork. (Id.)

After Plaintiff was designated DD2, he was incarcerated at Donovan from February 5, 2015 to February 26, 2015, and then from March 6, 2015 to April 21, 2015, and then from March 7, 2016 to March 26, 2016. (Doc. 63-8, at 4-5, Decl. Pope at ¶ 10.) While he was at Donovan during these times, Plaintiff received reasonable accommodations in accordance with the *Clark* Remedial Plan including assistance in reading and completing forms and documents, such as inmate appeals, Form 22 Requests for Interview, and other documents. (Id.)

Plaintiff was endorsed to California State Prison, Los Angeles County (LAC) on February 25, 2015, and arrived at LAC as a permanent transfer on April 21, 2015. (Doc. 63-7, at 2, Decl. Ulstad at ¶ 4.) While housed at LAC, Plaintiff was transferred to Salinas Valley State Prison on May 28, 2015, for mental health treatment and returned to LAC on March 26, 2016. (Id.)

While Plaintiff was incarcerated at LAC, staff logged DDP assistance that he was given. (Doc. 63-7, at 2-3, Decl. Ulstad at ¶ 5.) The Adaptive Support Log indicates that Plaintiff was given daily help in accordance with *Clark v. California* Remedial Plan, including prompts to shower, to clean his cell, and to go to the dining hall, the day room, group therapy, and the law library. (Id.) Staff regularly checked on Plaintiff's welfare. (Id.) This assistance included helping Plaintiff with his mail, with filing out inmate appeals, requests for interview forms, and other CDCR forms and legal paperwork, and with reading forms and legal paperwork, and writing letters to relatives. (Id.)

The Adaptive Support Log shows that Plaintiff received accommodations for his developmental disability while at LAC, including assistance with the inmate appeals process, in accordance with the *Clark v. California* Remedial Plan. (Id.)

Also, the Library Technical Assistant at LAC provided Plaintiff with help in the law library upon his request. (Doc. 63-6, at 2, Decl. Ibbotson at ¶ 3 and Exhibit 1.) This help included typing letters and other documents and reading aloud to Plaintiff. (Doc. 63-6, at 2-3, Decl. Ibbotson at ¶¶ 3-8 and Exhibits 1 and 2.)

While at LAC, Plaintiff was endorsed to CMF on July 19, 2016, and he was permanently transferred to CMF on August 4, 2016. (Doc. 63-7, at 2, Decl. Ulstad at ¶ 4.)

Since arriving at CMF, Plaintiff's DDP status has been noted and he is receiving reasonable accommodations according to the *Clark* Remedial Plan as noted in the DDP-Adaptive Support Log for CMF. (Doc. 63-4, at 2-3, Decl. Wofford at ¶ 4.) Because of Plaintiff's DDP status, he has and will continue to receive help reading and preparing CDCR forms, including inmate appeals, requests for reasonable accommodations, and requests for interviews. (Id.)

Since the beginning of his incarceration with CDCR on July 15, 2012, Plaintiff has filed more than thirty health care appeals. (Doc. 63-9, at 3-4, Decl. Robinson at ¶ 8 and Exhibit 1.) About half of his health care appeals were either granted or partially granted at different levels of review. (Id.) And Plaintiff took thirteen of those appeals to the third level of review. (Id.)

B. Plaintiff's Proffer

Plaintiff submitted a document entitled "Narrative Discharge Summary" and dated January 8, 2015. (Doc. 76, at 66-68.) In it, Plaintiff stated, "Custody retaliated on me for writing 602s." (Id.) The report showed that Plaintiff's depression was being treated with medication and that he was engaging in hunger strikes over the retaliation he was facing. (Id.) Plaintiff also submitted a letter written by inmate Chuck Vannort on behalf of Plaintiff. (Doc. 76, at 62-64.) Addressed to Warden Paramo, the letter communicated the retaliation Plaintiff experienced from Officer Buenorostro and other staff. (Id. at 62.)

Plaintiff also submitted an affidavit from inmate Ruben D. Gasaway, who attested that he gave "limited" assistance to Plaintiff with his section 1983 complaint. (Doc. 76, at 59.) Plaintiff also submitted an affidavit from inmate Kendall Cooke, who stated that he witnessed Plaintiff being retaliated against and beaten up and heard an inmate yell that Plaintiff had cut his wrists. (Id. at 58.) Plaintiff submitted a 602 staff complaint response dated January 9, 2015, which stated that staff was considering Plaintiff's complaint that correctional officers S. Bustos and C. Meza "threatened, intimidated, and disrespected" Plaintiff in front of other inmates and that Meza and Bustos had "a total disregard for inmates who are participants in the Mental Health Services Delivery System at the Enhanced Outpatient level of care." (Doc. 76, at 49.) Plaintiff also submitted a Director's level decision on a 602 appeal dated November 14, 2014, which ordered that Plaintiff be administered a DDP *Clark*

8

Adaptive Support Evaluation at RJ Donovan within two weeks by a DDP psychologist. (Doc. 76, at 47.) In a Director's Level Modification dated January 13, 2015, the order stated that Plaintiff was not at RJ Donovan when the order for DDP testing was received but that Plaintiff was seen on January 29, 2015 at his current institution for a CASE evaluation and that he was placed in the DDP program at the DD2 level. (Doc. 80, at 38.)

Plaintiff submitted a copy of the November 10, 2010 order of Superior Court Judge Morris Jacobson, who stated that the court found Plaintiff to be developmentally disabled within the meaning of Penal Code section 1370.1. (Doc. 80, at 18.) Plaintiff submitted chronicles from correctional staff noting that Plaintiff was on a hunger strike for not receiving sufficient help filing appeals due to his not being able to read and write. (Doc. 80, at 22.) Plaintiff also submitted his psychologist report, which noted that Plaintiff had to pay other inmates to write out his appeal forms because he is illiterate. (Doc. 80, at 28.) The report also referred Plaintiff to Dr. Zudiker's DDP team for possible evaluation for DDP placement. (Doc. 80, at 28.)

## IV.

## STANDARD OF REVIEW

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Adickes v. SH. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). Thus, a motion for summary judgment under FED. R. CIV. P. 56 addresses the sufficiency of the evidence, or of the law, to support the plaintiff's claims. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for

the non-moving party.  Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  Id.; Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1105 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine, 210 F.3d at 1102. If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting FED. R. CIV. P. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air; rather, it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Juell v. Forest Pharms., Inc., 456 F. Supp. 2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v.. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477

U.S. at 249; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Moreover, self-serving declarations, uncorroborated by other testimony or other persuasive evidence, cannot create a genuine issue of fact sufficient to defeat summary judgment. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Additionally, while the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). After discovery, if the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

## V.

## DISCUSSION

Prisoners "may ... claim the protections of the Due Process Clause[, and they] may not be deprived of life, liberty, or property without due process of law." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). In the prison context, "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." Sandin v. Conner, 515 U.S. 472, 483-84 (1995). Importantly, due process protections attach to state actions which impose an "atypical and significant hardship on the inmate in relation to ordinary incidents of prison life." Sandin, 515 U.S. at 484. For example, "[t]he Due Process Clause requires that staff assistants provide effective communication to developmentally disabled prisoners during disciplinary proceedings where there is a protected liberty interest at stake." Clark v. California, 739 F. Supp. 2d 1168, 1180 (N.D. Cal. 2010).

It is important to note, though, that "[t]he ADA and Rehabilitation Act ... require *more than* compliance with due process requirements: they require that a disabled individual be provided with 'meaningful access' ...." Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001) (emphasis added). The law is unclear if the *Clark* Remedial Plan's requirements for developmentally disabled inmates to receive due

11

assistance implicates a liberty interest that is protected under the Due Process Clause. See Clark v. California, 739 F. Supp. 2d 1168, 1232 (N.D. Cal. 2010)("in order to avoid deciding an unnecessary constitutional issue" of whether the Defendants' conduct against disabled inmates violated due process, the district court declined to reach the issue.)  The Supreme Court has hinted that liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995) (citations omitted). In sum, whether a liberty interest is created by the *Clark* Remedial Plan would seem to hinge on whether a developmentally disabled inmate who has been denied required assistance suffers an atypical and significant hardship as a result of the denial of *Clark*-mandated assistance.

    Here, Plaintiff alleges that Defendants Warden Paramo and Secretary Beard ignored his developmental disability and did not provide him with adequate assistance to file grievances with the prison. Plaintiff argues that because he was deemed mentally incompetent to stand trial for a short period of time before successfully being tried and convicted he should have been considered developmentally disabled for purposes of receiving prison assistance with reading and writing. Defendants have put forth evidence that Plaintiff was tested for placement in DDP at the start of his current sentence in 2012 and that he did not get a low enough score to be placed in the program. (Doc. 63-8, at 2, Decl. Pope at ¶ 3.) Starting in March 2014, Plaintiff filed numerous administrative appeals regarding his desire to be classified as a DDP inmate and eventually received a favorable response from the prison, the record shows. (Decl. of Robinson at ¶ 9.) Defendants have shown that Plaintiff was retested for DDP assistance and given a *Clark* Adaptive Support Evaluation (CASE) at the California Institution for Men on January 27, 2015. (Doc. 63-5, at 11, Exhibit 4 to Decl. Custodian of Records.) Following this evaluation, Defendants have provided evidence that he was placed in the DDP program at the DD2 level, meaning he may need occasional prompts to initiate or complete self-care and daily life activities; he may need adaptive supports and additional supervision for appropriate interaction with others, following rules, and avoiding social isolation; and he may need help in reading, writing, and preparing documentation. (Id.; Doc. 63-8, at 12, Exhibit 3.) After Plaintiff was designated as a DDP

1  inmate, he has been incarcerated at Donovan from February 5, 2015 to February 26, 2015, and then from
2  March 6, 2015 to April 21, 2015, and then from March 7, 2016 to March 26, 2016. (Doc. 63-8, at 4-5,
3  Decl. Pope at ¶ 10.) While being held at Donovan during these times, Plaintiff has received
4  accommodations in accordance with the *Clark* Remedial Plan including assistance in reading and
5  completing forms and documents, such as inmate appeals, Form 22 Requests for Interview, and other
6  documents. (Id.) Furthermore, Defendants have put forth evidence that they did not interfere with
7  Plaintiff's access to the inmate appeals process. Since the beginning of his incarceration with CDCR on
8  July 15, 2012, Plaintiff has filed more than thirty health care appeals. (Doc. 63-9, at 3-4, Decl. Robinson
9  at ¶ 8 and Exhibit 1.) About half of his health care appeals have been either granted or partially granted
10 at different levels of review. (Id.) And Plaintiff has taken thirteen of those appeals to the third level of
11 review. (Id.)

12      From the evidence presented by Defendants, the Court does not detect facts that implicate a liberty
13 interest at stake, which is the heart of Plaintiff's sole claim under consideration against Defendants in
14 this motion for summary judgment. Plaintiff alleges that he was prevented from filing inmate appeals
15 because of his disability in violation of Due Process, but the record shows that Plaintiff was able to file
16 administrative appeals sans DDP status through the help of other inmates according to Plaintiff's own
17 admission. (Doc. 80, at 28.) With or without help, Plaintiff filed over thirty inmate appeals and took
18 thirteen of those appeals to the third level of review. (Doc. 63-9, at 3-4, Decl. Robinson at ¶ 8 and
19 Exhibit 1.) Although Plaintiff has also put forth evidence where he is quoted saying, "Custody retaliated
20 on me for writing 602s," this merely colorable evidence does not flesh out any specific details of an
21 "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"[2] that
22 has been caused by the prison's long delay in classifying Plaintiff as an DDP inmate.  As Plaintiff has
23 been free to file inmate appeals and has been granted what he has requested – DDP status – before the
24 filing of this lawsuit, this Court fails to detect a liberty interest at stake in where process is
25 constitutionally due. (Doc. 63-8, at 4, Decl. Pope at ¶ 9; Doc. 63-8, at 30, Exhibit 6.) As the evidence
26 shows that there isn't a genuine issue of material fact in Plaintiff's Due Process claim, Defendants

---

[2] Sandin v. Conner, 515 U.S. 472, 484 (1995).

13

Warden Paramo's and Secretary of CDCR's summary judgment motion on this sole operative claim in Plaintiff's complaint should be granted.

## VI.

## CONCLUSION

This Report and Recommendation by the undersigned magistrate judge is submitted to United States District Judge Janis Sammartino, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1 of the United States District Court for the Southern District of California.

For the foregoing reasons, the court RECOMMENDS that Defendants' motion for summary judgment be GRANTED. Any written objections to this Report and Recommendation must be filed with the Court and a copy served on all parties on or before **February 24, 2017.** The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **March 6, 2017.** The parties are advised that failure to file either of these documents within the specified time periods may waive the right to raise those objections on appeal of this Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATE: <u>February 9, 2017</u>

Peter C. Lewis
U.S. Magistrate Judge
United States District Court